## DÍAZ *v.* TORRES.

### APELACIÓN procedente de la Corte de Distrito de San Juan.

No. 526.—Resuelto en abril 28, 1911.

APELACIÓN—APRECIACIÓN DE LA PRUEBA—ERROR MANIFIESTO.—En los casos en que la corte inferior hubiere incurrido en manifiesto error al hacer la apreciación de las pruebas, procederá la revocación de la sentencia apelada, sin que pueda constituir un obstáculo para tal revocación la circunstancia de que todas las pruebas practicadas, ante la corte inferior no se hubieran incluído en la exposición de hechos, pues para que así fuera habría que demostrar que las pruebas omitidas son necesarias para que el tribunal pueda colocarse en situación igual a la que tuvo la corte inferior al apreciar las pruebas.

DIVORCIO—ADULTERIO—RECONCILIACIÓN.—El mero perdón del agravio no es suficiente para que pueda estimarse que ha habido reconciliación entre las partes, siendo preciso que su unión hubiera continuado y se hubieran restablecido los derechos conyugales, de tal modo que el cónyuge culpable vuelva a ocupar la misma posición que ocupaba antes de que se cometiera la ofensa.

ID.—Dadas las circunstancias de este caso, no es posible admitir como prueba suficiente para establecer la existencia de la reconciliación, la afirmación hecha por la esposa en su declaración, contradicha por el esposo, al efecto de que ambos habían tenido unión carnal después de los hechos determinantes de la infidelidad.

ID.—INTERVENCIÓN DEL FISCAL—APELACIÓN.—En los casos en que el Fiscal del Tribunal Supremo hubiere intervenido en la tramitación del recurso de apelación en un caso de divorcio, no procede decretar la desestimación de dicho recurso, por no habérsele dado intervención al Fiscal de distrito ante la corte inferior, pues el consentimiento del propio interesado, que es el Fiscal, al no solicitar la nulidad del juicio subsana cualquier defecto que en su tramitación pudiera existir.

Los hechos están expresados en la opinión.

Abogados del apelante: *Sres. Bosch & Soto.*

Abogado del apelado: *Sr. Sandalio Torres Monge.*

Abogado de El Pueblo: *Sr. Jesús M. Rossy, Fiscal.*

EL JUEZ PRESIDENTE SR. HERNÁNDEZ, emitió la opinión del tribunal.

Con fecha 30 de noviembre del año 1909, Pedro Díaz Co-

rrea presentó demanda enmendada ante la Corte de Distrito del Distrito Judicial de San Juan contra Mercedes Torres Reyes, a fin de que se declarara roto y disuelto el vínculo matrimonial entre ellos existente, a virtud de matrimonio celebrado en 1 de agosto del año 1904, quedando las niñas procreadas durante ese matrimonio, a saber, Mercedes, Celia América y Dolores, de cinco, tres y uno y medio años de edad, respectivamente, bajo la custodia y patria potestad del demandante.

Aléganse como hechos fundamentales de la demanda, que desde seis meses antes el demandante empezó a observar en su esposa cierta conducta sospechosa, pudiendo convencerse y comprobar más tarde que mantenía ilícitamente relaciones amorosas con un tal Luis Alvarez, con quien le había sido infiel, teniendo voluntaria y maliciosamente intercurso sexual con el mismo.

Al contestar Mercedes Torres Reyes la demanda, aceptó la existencia de su matrimonio con el demandante y el nacimiento de las hijas habidas en el mismo; pero negó los hechos fundamentales de la demanda, y alegó que, en el supuesto de que fueran ciertos, la acción de divorcio estaría extinguida completamente por reconciliación de las partes, pues con posterioridad a esos hechos, los cónyuges vivieron juntos bajo un mismo techo hasta el día 25 de octubre de 1909 en que la demandada, de acuerdo con su esposo, se trasladó con sus hijos a la casa de su madre para que él pudiera marchar a España a darse los baños de Archena, habiendo dormido juntos la noche anterior del 24 de octubre, e ido el demandante posteriormente a la casa de la madre de la demandada, donde le entregó siete dollars para alimentos de ella y de sus hijos hasta el 10 de noviembre siguiente.

La demandada además formuló reconvención para que se declarara disuelto el vínculo matrimonial, quedando los hijos bajo la custodia y patria potestad de la madre; y funda tal pretensión en malos tratamientos e injurias graves del esposo respecto de la esposa, hasta el punto de haberle trasmitido

enfermedades graves de carácter sifílitico, acabando por ultrajarla en su honor de mujer y en su dignidad de esposa y madre mediante la falsa y calumniosa imputación que se le hace en la demanda.

Celebrado el juicio la corte dictó sentencia en tres de enero del año próximo pasado, concebida en los siguientes términos:

"El día ocho de diciembre de 1909 y en corte abierta, se llamó este pleito para la vista por su orden de señalamiento y comparecieron ambas partes por medio de sus abogados y anunciaron estar listas. La parte demandante presentó su prueba que fué practicada, haciendo lo propio la parte demandada, tanto en apoyo y en contra de la demanda y de la reconvención, respectivamente, quedando en dicho estado pendiente el caso hasta tomar declaración al testigo Dr. Clemente Fernández, de Carolina, a cuyo efecto señaló la corte el día veinte de diciembre de 1909, así como para llevar a efecto la inspección ocular de ciertos sitios, propuesta por las partes.

"El día veinte de diciembre, trasladóse la corte al pueblo de Carolina, y luego de recibir declaración al dicho Sr. Fernández y verificada la inspección ocular, se declaró el juicio concluso para sentencia.

"Y la corte, habiendo considerado debidamente el caso, y por los fundamentos que en opinión por separado consigna, resuelve dictar como dicta sentencia declarando sin lugar tanto la demanda como la reconvención, y ordenando queden los hijos en este matrimonio en poder de la madre, o sea la demandada, Mercedes Reyes Torres, hasta nueva orden de esta corte, con las costas al demandante."

Contra la anterior sentencia interpuso el demandante recurso de apelación para ante esta Corte Suprema, fundado en que habiéndose probado que el adulterio se ejecutó, y no probádose que haya existido reconciliación entre los cónyuges, ha debido declararse con lugar la demanda con arreglo al artículo 164 número 1°. del Código Civil reformado, según el cual es causa de divorcio el adulterio de cualquiera de los cónyuges.

Como se ve, fúndase el recurso en error en la apreciación de las pruebas practicadas en el juicio.

Veamos lo que dicen los testigos que a instancia del demandante declararon en el juicio.

Monserrate Comas, allá por el mes de octubre del año 1909, como Policía Insular, hizo investigaciones acerca de Mercedes Torres con motivo de denuncia de adulterio que a aquélla se imputaba, habiéndola visto entrar en una fotografía con un joven zapatero de Río Piedras, en compañía del cual la vió después en la calle de San Francisco de esta capital.

Juan B. Zalduondo, también Policía Insular, un día entre cuatro y cinco de la mañana, en ocasión en que vigilaba la casa de Pedro Díaz con su corral y otro contiguo, vió penetrar en el patio de la referida casa a un hombre que supuso fuera el demandante; pero a los dos o tres días después, habiéndole comunicado su jefe una confidencia para que investigara el adulterio de Mercedes Torres con Luis Alvarez, le fué mostrado el Alvarez, y reconoció ser el mismo que había visto entrar por la palizada de la casa de Pedro Díaz.

Juan de los Santos Calderón y Gregorio Rivera, en una noche del mes de octubre del año de 1909, saliendo del pueblo de Río Piedras para el campo, vieron a Mercedes Torres y a Luis Alvarez salir de la cochera de Enrique Vizcarrondo.

José Valentín Berríos, pariente de Pedro Díaz Correa, ha visto a Mercedes Torres y a Luis Alvarez en distintas horas del día andando por las calles de San Juan; y habiendo tenido una entrevista con Alvarez, sobrino de Pedro Díaz, le manifestó que estaba en la obligación de evitar los rumores que corrían acerca de él y Mercedes Torres.

Ramón López vió una noche, serían las nueve y media, a Mercedes Torres y Luis Alvarez paseando por la plaza de Río Piedras con una niña que Mercedes llevaba de la mano.

Leoncio Rodríguez ha visto varias veces a Luis Alvarez entrar en la casa de Mercedes Torres, y el día 20 de julio de 1909, en momentos en que Pedro Díaz no estaba en la referida casa, vió a Alvarez y a la Mercedes llegar a ella, entrando Alvarez en un cuarto y yéndose la Mercedes para dentro.

Fernando Sovejano y Jesús Velilla, entre diez y once de la noche del día 17 de octubre de 1909, vieron salir de la casa del zapatero Luis Alvarez a Mercedes Torres envuelta en un mantón, y habiéndola seguido a quince o veinte pasos de distancia, observaron que entró en la casa de Pedro Díaz Correa; y el propio Jesús Velilla en otra ocasión, serían las nueve o nueve y media de la noche, vió a la Mercedes y a Luis Alvarez debajo del arco de la escalera del edificio de la Normal de Río Piedras acostado él sobre ella, ejecutando actos carnales.

Ramón Piñero, cuatro o cinco meses antes de la celebración del juicio, como a la nueve o nueve y media de la noche, regresando a Río Piedras desde el barrio del Río, encontró a una niña de cuatro a cinco años en las afueras de dicho pueblo sentada en el pretil del puente, y a Mercedes Torres y al zapatero Luis Alvarez sentados debajo de dicho puente; y otra noche, serían las siete, vió a la misma niña jugando en la yerba, y a los mismos Luis Alvarez y Mercedes Torres sentados en un banco o escaño que existe yendo para el cuartel de la Policía Insular de Río Piedras.

Luis Pérez vió una noche, en los primeros días del mes de octubre de 1909, entre siete y siete y media, a Mercedes y al zapatero Alvarez conversando de pie debajo de un palo de mangó en la hacienda de Solís de Río Piedras.

Francisco Piñeiro vió también en la noche expresada y antes que Luis Pérez, a la Mercedes y al Alvarez, bajo el mismo palo de mangó, uno encima del otro.

Y finalmente, Juan Díaz Correa, hermano del demandante, serían las dos de la tarde del 27 de septiembre de 1909, fué a la tienda de Pedro Díaz Correa para verificar un pago, y no estando allí, pasó a la sala de la casa, encontrando a Luis Alvarez en la cama acostado con Mercedes Torres, habiéndose tirado el Alvarez por una ventana, de lo que dió conocimiento el testigo a su referido hermano para que hiciera lo que debía hacer.

Contra esos testimonios tendentes a demostrar el funda-

mento de la demanda, o sea el adulterio de la demandada,
¿qué pruebas se han aducido por ésta?

Esas pruebas consistieron en las declaraciones de Maxi-
miliano Torres, Pedro Díaz Correa, Mercedes Torres, Deme-
trio López, Juan López Sicardó, Benito Rivera y José Valen-
tín Berríos.

Según declara Maximiliano Torres, hermano de la Merce-
des, el día 14 de octubre de 1909, con motivo de llamamiento
que se le hiciera por teléfono, fué a Río Piedras por la noche,
y allí le manifestó su cuñado Pedro Díaz que quería ir a
Archena y deseaba que la Mercedes y los niños se quedaran
en la casa del testigo, como en efecto fueron a ella con una
sirvienta el lunes 25 de octubre citado.

Pedro Díaz Correa refiere que en la noche en que Maximi-
liano Torres estuvo en su casa, se habló del divorcio que
pensaba proponer contra Mercedes Torres por tener prue-
bas de que había cometido adulterio; que sufragó los gastos
del domicilio conyugal hasta el 25 de octubre en que la Mer-
cedes se fué de la casa llevándose algunos muebles; que su
hermano Juan Díaz Correa le habló en 27 de septiembre de
la infidelidad de su esposa, pero creyó que no era suficiente
prueba para promover el divorcio lo que su hermano le había
revelado, y por esa razón y porque había dado cuenta a la
policía para que los guardias pudieran declarar, siguió vivien-
do con la demandada y las niñas hasta el día 25 de octubre;
que estuvo en la casa de la madre de Mercedes Torres, a la
que entregó siete pesos cincuenta centavos para sus gastos y
los de sus hijos en quince días; que en la fecha en que declara-
ba hacía seis o siete meses que no había tenido contacto sexual
con su esposa, a la que nunca ha injuriado, si bien ella ha ido
donde médicos a pedirles certificaciones sobre supuestos atro-
pellos; que jamás ha consentido en vivir nuevamente con su
esposa, aunque ésta le ha propuesto olvidar lo pasado y re-
conciliarse, reconciliación que tambíen inútilmente le han pro
puesto sus hermanos; que Alvarez, por espacio de dos meses
más o menos, comió en su casa, y viendo que conversaba mu-

. cho con la Mercedes, le ordenó que se retirara y que fuera de-
jando las visitas, lo cual tomó aquél como ofensa; y que des-
pués recibió dos cartas anóminas sobre el asunto, las que
rompió por haberle dicho la Mercedes y su familia que eran
calumniosas.

Mercedes Torres dice que hasta el día 25 de octubre vivió
bajo un mismo techo con su esposo Pedro Díaz, teniendo ac-
tos carnales en la noche anterior; que en los primeros días
de su matrimonio comenzó Pedro Díaz a insultarla y a los
tres meses el Dr. Fernández le reconoció una afección sifilí-
tica que le había comunicado; y relata los disgustos, injurias
y malos tratos de que ha sido víctima durante su matrimonio.

Demetrio López, Conserje de la Escuela Normal de Río
Piedras, donde prestaba servicios de nueve y media de la
mañana a cinco y media de la tarde, no ha visto en el mes de
octubre en los alrededores del edificio a Mercedes Torres, y
tampoco ha notado allí algo extraordinario.

A Juan López Sicardó mereció Mercedes Torres concepto
de mujer honrada.

Benito Rivera compró a Pedro Díaz el establecimiento
de comercio en once o doce de octubre de 1909, y demandante
y demandada continuaron viviendo en la misma casa doce o
catorce días después.

José Valentín Berríos tuvo diferencias en su amistad con
la familia Díaz por motivo de una cuenta de que le era deudor
el demandante, en cuyo arreglo intervino el joven Luis Al-
varez.

Esas pruebas no contrarrestan ni desvirtúan las de la
parte demandante en la parte relativa al adulterio de Merce-
des Torres, cuya declaración sólo tiende a demostrar que su
marido era celoso, que le daba mal trato, y que hasta el día
25 de octubre hicieron vida común, uniéndose carnalmente en
la noche anterior.

La evidencia del adulterio no puede ser más completa y
opinamos que la corte inferior ha procedido con manifiesto

error al no estimar probada la infidelidad conyugal de Mercedes Torres.

Es cierto que, según el artículo 38 de là Ley de Evidencia, là credibilidad de los testigos podrá ponerse en duda conforme lo dispuesto en el artículo 21, cuyo artículo ordena que se presume que un testigo dice la verdad por más que esa presunción pueda ser rechazada por la forma en que declare, por el carácter de su declaración o por evidencia que afecte su veracidad, honradez, integridad, o móviles o por evidencia contradictoria; estableciendo el artículo 162 que el efecto de la evidencia no es arbitrario, sino que se ejercerá con discreción jurídica y sujeción a las reglas de evidencia, y que el tribunal o jurado no está obligado a decidir de conformidad con las declaraciones de cualquier número de testigos que no llevaren a su ánimo la convicción contra un número menor o una presunción u otra evidencia que le convenciere.

En el presente caso no encontramos que los testigos de la parte demandante hayan faltado a la verdad en una parte de su declaración para que ésta deba ponerse en duda respecto a otras, según el tercer apartado del artículo 162, ya citado, ni que esos testigos al declarar se hayan contradicho en sus manifestaciones, ni que hayan declarado sobre hechos de los cuales no hayan podido tener conocimiento, ni que hayan obrado por móviles interesados o indignos, ni que sus manifestaciones estén en conflicto con otra evidencia, ni que hayan sido impugnadas su veracidad, honradez e integridad, mediante la oportuna evidencia.

Admitimos que ordinariamente los actos de infidelidad conyugal no se realizan ante testigos y que por el contrario, para ellos se busca la soledad y se procura envolverlos en las sombras del misterio; pero eso no impide que una pasión fogosa oscurezca la razón e impulse la voluntad a ejecutarlos bajo la creencia errónea de que no han de ser vistos, y en realidad lo sean, como ha podido suceder en el presente caso.

Los actos de infidelidad conyugal, aunque ordinariamente reservados, no son por su naturaleza ajenos a la inspección de los sentidos.

Observamos que en la sentencia recurrida se hace mérito de haberse recibido declaración en el pueblo de Carolina al testigo Dr. Clemente Fernández, y de haberse practicado por la corte la inspección ocular de ciertos sitios que propusieron ambas partes, sin que conste en el récord el resultado de esas diligencias. Tal omisión no impide que hayamos podido examinar todas las pruebas que han venido incluídas en la exposición del caso, y que prescindiendo de las pruebas omitidas podamos revocar la sentencia apelada.

Al decidir en 15 de enero de 1909 el caso de *Francisco Vargas* v. *A. Monroig e hijos*, digimos:

"Hay una regla de ley que expresa que antes de que un tribunal de apelación pueda revocar una sentencia basada en el veredicto de un jurado o cuando la corte está sustituída por el jurado, tal corte de apelación debe estar en condiciones de poder conocer de todos los hechos que fueron presentados a la corte inferior. Esta regla de ley es aplicable cuando la corte inferior ha considerado los hechos y fundado su sentencia definitiva en los mismos. Pero debe mostrarse en cualquier caso que se ha omitido alguna prueba y que la prueba que ha sido omitida es importante o necesaria para el caso."

El récord no muestra que la declaración del testigo Dr. Clemente Fernández y la inspección ocular practicada por la corte inferior sean necesarias para colocarnos en igual situación que la que tuvo el tribunal inferior al apreciar las pruebas relativas al adulterio de la demandada. Aún más, parécenos que la declaración del testigo Dr. Clemente Fernández había de tender a probar la afección sifilítica a que alude la demandada en su declaración, y que la inspección ocular no influyó en la apreciación de las declaraciones de los testigos que declararon sobre actos carnales constitutivos de adulterio de la demandada, pues nada nos dice de ello la parte apelada al impugnar en su alegato la fuerza probatoria

de esas declaraciones, las que en sí nada tienen de improbables, ni están en conflicto con otra evidencia, ni han sido hechas por testigos cuya veracidad, honradez e integridad hayan sido impugnadas, como ya hemos dicho.

En la opinión del juez que la parte apelada inserta en su alegato, no se niega crédito a los testigos atendido el resultado de la inspección que practicó el juez, sino por el carácter de sus declaraciones y por el hecho de haber seguido viviendo maritalmente bajo el mismo techo demandante y demandada.

Las palabras del juez son las siguientes:

"En el pleito actual el carácter de las declaraciones de los testigos del demandante no han impresionado bien a esta corte. Han declarado haber visto a la demandada en varios sitios cerca del pueblo de Río Piedras cometiendo actos de adulterio con un individuo de tal pueblo en varias horas de la noche. Parece extraordinario que la demandada y su querido (si hubo tal querido) no se ocultaran para satisfacer sus deseos. Un testigo, hermano del demandante, dice haber visto a la demandada en actos de adulterio en uno de los últimos días del mes de septiembre de 1909 y dice también haber relatado el hecho al demandante; presumiendo que esta declaración sea cierta resulta que el demandante y la demandada siguieron viviendo maritalmente bajo el mismo techo durante un mes. Con tales bases una demanda de divorcio por adulterio no puede prosperar."

El carácter de las declaraciones de los testigos no puede despojarlas en el presente caso del crédito que merecen, por las razones ya expuestas. En cuanto al hecho de haber seguido Pedro Díaz Correa viviendo con su consorte después de haber tenido conocimiento de su infidelidad por la revelación que le hiciera su hermano Juan Díaz Correa, el mismo demandante explica en su declaración la razón de su proceder; pero aunque no fuera admisible esa razón, el hecho de haber seguido viviendo juntos ambos consortes nunca demostraría que entre ellos medió reconciliación, y al efecto, reproducimos como aplicables al presente caso lo que ya digimos al resolver en 2 de abril de 1902 el de *Alberto Bravo* v. *Angélica Franco:*

"Las pruebas en el conjunto no son de naturaleza tal, que lleven al ánimo de este tribunal la convicción de que el recurrente haya perdonado la ofensa o que haya ocurrido tal reconciliación; debiendo tenerse presente la doctrina siguiente: 'el mero perdón del agravio no es suficiente sino que es preciso que continúe la unión de las partes y se restablezcan todos los derechos conyugales. (Am. Eng. Ency. of Law.) Y además, que condonación significa borrar la ofensa imputada, de modo que el ofensor vuelva a ocupar la misma posición que él o ella ocupaban antes de que se cometiera la ofensa. La palabra perdón, según se emplea generalmente en el idioma inglés, no expresa todo el significativo de la palabra 'remisión.' Una persona puede perdonar en el sentido de no tener resentimiento o no tratar de castigar, sin que en manera alguna sea su intención restablecer al ofensor en la situación que ocupaba.' (Am. Eng. Ency. of Law.) El Tribunal Supremo de España en sentencia de junio 23 de 1874, en una causa criminal por adulterio seguida por el marido contra su esposa se expresó en los siguientes términos: Considerando que respecto al recurso interpuesto en nombre de \* \* \* y su primer fundamento, que los hechos admitidos como probados en la sentencia que es objeto del recurso, de las cartas amorosas dirigidas mutuamente entre los procesados, sus citas y entrevistas en diferentes sitios, especialmente en la casa pública de citas, demuestran sin dejar duda, no sólo su trato ilícito, sino los actos que constituyen adulterio y son consiguientes a esas relaciones. En lo referente al segundo fundamento, que por los hechos de continuar la procesada, en la habitación de su marido, acompañarla éste en los paseos, teatros, después de haber sido sorprendida con el \* \* \* no se infiere el consentimiento de su infidelidad, ni el perdón, ni menos en el caso presente cuando ha formalizado querella y continuado parte en la causa para la imposición de pena, y siéndolo aún en este recurso.''

Bajo las circunstancias del caso y considerado el punto de vista erróneo bajo el cual el juez inferior apreció las pruebas del demandante, no podemos admitir como prueba bastante de reconciliación la afirmación hecha en su declaración por la esposa, contradicha por el esposo, de haber tenido ambos unión carnal después de los hechos determinantes de la infidelidad.

Se ha alegado por la parte apelada al impugnar el recurso y pedir su desestimación, que el Fiscal ha debido tener

intervención en el presente pleito como parte legítima y necesaria en los casos de divorcio.

Tal alegación es extemporánea, pues debió hacerse en tiempo oportuno ante la corte inferior; pero como después de pronunciada sentencia, el Fiscal de la corte de distrito fué notificado del escrito de apelación y ha tenido intervención en el recurso, solicitando en su alegato escrito la confirmación de la sentencia apelada, sin que haya alegado la nulidad del juicio por haberse tramitado en la corte inferior sin su intervención, opinamos que, en el caso de existir tal defecto, ha sido subsanado por consentimiento de la parte interesada que es el Fiscal, holgando, por tanto, discutir si el Fiscal en los casos de divorcio ha de tener otra intervención además de la que le atribuye la sección 4ª. del Reglamento de esta Corte Suprema.

Evidenciado que el adulterio se ejecutó y no habiéndose probado que haya habido reconciliación entre los cónyuges, procede que con revocación de la sentencia apelada, en la parte en que ha sido recurrida, se declare con lugar la demanda de divorcio con los pronunciamientos solicitados en la misma.

*Revocada.*

Jueces concurrentes: Sres. Asociados MacLeary, Wolf y del Toro.